## The Blue Bonnet.

*(District Court, S. D. New York. January 9, 1882.)*

1. COLLISION—DUTY OF STEAMER ON APPROACHING TUG AND TOW.

Where a steamer is approaching a tug and tow in a dangerous part of a narrow stream both are bound to exercise special vigilance and caution. The steamer has no right to proceed unnecessarily, so as to be set possibly by the tide upon the tow's side of the stream, but should stop betimes, if need be, to allow the tow to pass.

2. SAME—TUG AND TOW—DUTY OF—DANGER SIGNALS.

A tug and tow being in a bend of a narrow stream, and upon the side towards which the tide directly sets, should not occupy unnecessarily the full half of the stream. If they do so, the tug is bound to give danger signals upon the first indication of possible collision, and to change her course betimes and give way as much as possible, and stop if necessary.

3. SAME—RIVER NAVIGATION—BOTH IN FAULT.

Where the steam-tug B. B. was coming down the Raritan river against a flood tide with a tow of 14 loaded canal-boats, in all about 95 feet wide by 300 feet long, attached to the tug by hawsers 40 fathoms in length, and was in a bend of the river from 350 to 400 feet wide on the side towards which the flood tide was setting from a straight reach below the bend, and the steamer A. was coming up the river with the tide, each having proper lights and duly signalled by the other when half a mile apart to keep to the right, and where each kept on in full view of the other's lights, and both ported at about the same time, but too late to avoid a blow from the tug upon the port quarter of the steamer, whereby the course of the latter was so changed as to carry her with the tide against the tow, whereby one of the canal-boats was sunk: *Held,*—upon contradictory testimony as to the place of the collision in the stream, each vessel claiming that she was hugging her own side of the river,—that the tow fully covered her own half of the stream, and that both the tug and steamer were in fault.

In Admiralty.

*Benedict, Taft & Benedict,* for libellants.

*Beebe, Wilcox & Hobbs,* for the Blue Bonnet.

*Owen & Gray,* for the steamer Annie.

BROWN, D. J. This libel is filed by the owners of the canal-boat Cato to recover damages for the loss of the boat and cargo through a collision on the Raritan river in the evening of April 7, 1879.

The Cato formed one of 14 boats in tow of the steam-tug Blue Bonnet, bound from New Brunswick to New York, and attached by a port and starboard hawser about 40 fathoms long, running to each side of the tow. There were three tiers of boats—five in the two forward tiers, and four in the after tier. The Cato was in the head tier, and was the second boat from the port side. They left New Brunswick at about 6 P. M. and reached the place known as the Brick-

Kilns, about seven miles distant, from 8 to half past 8 in the evening. The night was clear, with moonlight. As the Blue Bonnet was passing the Brick-Kilns the steam-propeller Annie, bound up the river from New York to New Brunswick, collided with the Blue Bonnet by the port quarter of the steamer coming in contact with the port bow of the tug. The blow was sufficient to send the stem of the steamer to port, and she went rubbing along the side of the tug, with her engines backing and her wheel to port, until after passing the tug her bows crossed the port hawser of the tow and struck the starboard bow of the Cato, inflicting damage from which the latter afterwards sank.

The place of the collision was in a cove or bend of the river, which, after running about half a mile in a course S. S. W., curves to E. S. E. for about a quarter of a mile, past Washington creek and the Brick-Kilns, and then bends to the N. E. for about half a mile past Sayresville. Towards the upper part of the bend of the river the creek or canal known as Washington canal runs from the river in a southwesterly course. This canal at its mouth is about 150 to 200 feet wide. At the lower side of the canal there is a bulk-head which extends down the river about 600 feet, and is known as the Brick-Kilns. At the time of the collision the tide was flood. This tide sets up the half-mile reach past Sayresville and across the river towards the Brick-Kilns and Washington canal, part of the tide passing up the canal and the rest rounding to the upper side of the bend. The Raritan around this bend varies from 350 to 400 feet wide.

The stern of the Annie, after her bows struck the Cato, was thrown through the combined action of the tide, her reversed engines, and the collision, nearly directly across the river and towards the southern shore, bringing her nearly broadside in front of the hawser tier of boats; and in that position, her engine being again reversed, she moved forward out into the northerly part of the stream, and so cleared the tow and went on her course up the river.

From this situation of the Annie, which is verified substantially by all the witnesses, it is manifest that she was at the time of the collision at least as far to the southward as the center of the stream; otherwise she could not possibly have cleared the tow in the manner that she did. She was 149 feet long, and as she lay in front of the hawser tier of boats her captain says that she was 30 or 40 feet from the southerly shore.

The usual lights were carried by both vessels. Those on each were

seen by the other from half a mile to a mile distant. When half a mile distant, one signal whistle was blown by the tug, which was answered by the propeller, signifying that each was to keep to the right. Both were accustomed to the navigation of the river, and were well acquainted with its peculiarities, the set of the tides, and the difficulties of tows in rounding the curves. The Annie was without any encumbrance, and there can be no sufficient excuse for her being found in the southerly half of the stream, where she knew there was a tow approaching. The witnesses on her part testify that the tide was such as to set her stern towards the southerly shore; while her bows pointed somewhat towards the northerly shore; and such, I think, all the evidence shows was her position at the time her port quarter struck the bows of the Blue Bonnet; and doubtless but for this blow, and her bows being thereby thrown to port, she would have passed clear of the tow, at that time some 300 feet distant.

On the part of the Annie it is claimed that when thus struck by the Blue Bonnet her stem was within 25 feet of the northerly shore, and that the collision with the Blue Bonnet arose from a quick sheer by the latter to port under a starboard helm. But the position of the tow and of the Annie in front of it, just after the collision, with her stern very near the southerly shore, and her mode of getting clear by going ahead directly across the river, all show that her position at the time of colliding with the Blue Bonnet is placed by her witnesses much nearer to the northerly shore than she could then have been. The evidence shows that she must have been fully out into the middle of the stream. The lights of the tug and tow were clearly seen; the set of the tide was known; and if she were not easily able to keep well within the northerly half of the stream, it was her duty to stop, which she might easily have done, and to allow the tug to pass her before she entered the bend of the river. Nor does there seem to be any reason why she did not port earlier than she did; and no attempt to stop her was made until after she had struck the Blue Bonnet. Without further discussion of the testimony it seems to me quite plain that the Annie was in fault.

Whether the Blue Bonnet was also in fault is a question of more difficulty. Most of the witnesses in her behalf testify that at the time she struck the Annie she was hugging the southerly shore at a distance from it of 10 to 30 feet only, and that the starboard boat of the tow was equally near the shore.

If this estimate of their distance from the shore were correct, a

collision between the Blue Bonnet and the Annie would have been in the highest degree improbable. Even making allowance for the set of the tide, it is almost incredible that the Annie, with the tug in full view and the stream at that point about 400 feet wide, could have got within 50 feet of the southerly shore. It is also very difficult to perceive how the Annie could, so near the southerly shore, have got into the position assigned her by all the witnesses,—that is, with her stern somewhat pointed toward that shore,—so as to be struck by the Blue Bonnet on her port quarter; further towards the middle of the stream that position would be easily taken upon porting. There was no possible reason for the Annie being so far on the southerly side of the river. Apparent distances upon the water in the night-time are specially deceptive. The Blue Bonnet, very shortly after the collision, did come near to the docks; and as there is other testimony which is more accordant with the probabilities, I might say with the necessary facts, of the case, I conclude that the witnesses who place the Blue Bonnet so near to the southerly shore at the time of the collision have not distinguished her position just after the collision from that at the time of and prior to the collision.

The captain of the Blue Bonnet came on deck just before the first collision, saw they would hit, and went aft, where he stood and watched what took place. He testifies that the tug and tow covered about 150 feet of the channel. The captain of the Annie, who was in the pilot-house, and in a situation to observe both the canal and the shore, testifies that as the Annie lay in front of the hawser tier of boats, after she had struck the Cato, her stern was 30 feet from the shore and at least 200 feet below the canal. As the Annie was 149 feet long, and her bows only extended as far as the Cato, and as there was another boat outside of the latter, this evidence would carry the port side of the tow very nearly 200 feet from the southerly shore; that is, rather more than half way across the river, which was not over 350 feet at that point. The width of the tow itself, which consisted of 5 canal-boats, was about 95 feet.

On the part of the Blue Bonnet it is urged, in answer to this mode of fixing the place of the tow in the river, that the stern of the Annie as she lay across the hawser pier ran up into the canal, and in support of that view the testimony of her witnesses is appealed to, showing that the head of the tow was not at that time below the canal. But I do not find that any of these witnesses were in a situation to observe with any degree of accuracy on this point. Capt. Hoagland,

though saying that the head of the tow was "about off the middle of the creek," adds: "Of course I was not back there to see; I could not tell 40 fathoms behind." The Annie, moreover, a larger boat, lay between him and the canal, and the captain of the Annie testifies that the steamer lay some 200 feet below the canal. None of the other witnesses on the part of the Blue Bonnet were in so good a place for observation as their captain, as they were all from 300 to 400 feet below the canal. After the collision, moreover, the tow floated with the tide up the canal, and the tow was about 300 feet long. Had the head of the tow only reached the middle of the canal at the time of the collision, so as to leave room for the stern of the Annie, as she lay across, to run up into the canal, three-fourths of the tow must have have been above the canal, and consequently above the influence of the flood tide that ran into the canal, and within the influence of that part of the tide which ran up the river. To have been carried up into the canal by the tide the tow must have been mainly out of the reach of the river part of the tide; otherwise, under the combined effect of both branches of the tide, the tow must necessarily have grounded upon the upper corner of the canal and river, where the shore was shelving.

I find, therefore, that the head of the tow was below the canal, as the captain of the Annie states. Her stern, as she lay across the hawser tier, might have been nearer the southerly shore than 30 feet, but she did not touch it, and the port side of the tow, which had one boat beyond the Cato and the Annie's bows, must therefore have been not less than 180 feet from the shore, and her starboard side not less than 85 feet distant.

This view, based upon what seem to be the necessary facts of the case, agrees very nearly with the testimony of Captain Kelly, of the Cato, who stands as a disinterested witness. He estimated the tow to be from 100 to 150 feet distant from the southerly shore, and from 120 to 150 feet wide. His estimate of the width of the tow is too large, as it was not over 95 feet wide. The same proportionate correction, applied to his estimate of the distance from the shore, would give about 80 feet from the shore to the starboard side of the tow, or about 175 feet to the port side of it; and this does not greatly exceed the distance given by the captain of the Blue Bonnet, who estimated it at 150 feet.

The Blue Bonnet was about 250 feet ahead of the middle of the tow. In rounding the bend of the river she necessarily went under

a helm kept somewhat to starboard. The pilot said that he starboarded just before the collision, until he saw that the Annie was not going to clear her; then he ported to avoid her, about half a minute before the collision, and the collision occurred "just as the Blue Bonnet was inclined to feel the effect of the port wheel;" and he says the Annie ported at the same time he did. The lookout, and one or two other witnesses on the part of the Blue Bonnet, testify that at the time of the collision the Blue Bonnet had come to a dead stop under reversed engines; but this is not compatible with other testimony, especially with that of the engineer, who testifies that he felt the blow of the collision; that the signal to stop was not over five seconds previous, and the engine had come to a stop only two or three seconds before the collision, and was not reversed until they afterwards went up into the canal.

On this view of the testimony, while it is obvious that the Annie is chiefly to blame for the collision, being without encumbrance, under perfect control, and having at least very nearly the whole northerly half of the stream at her disposal, the Blue Bonnet cannot be held without fault. Her tow extended out at least to the middle line of the river, in a short curve of a narrow stream, towards which the flood tide was directly setting. The situation was one of evident danger from a vessel approaching with the tide from below, and demanded special caution on the part of the Blue Bonnet as well as the Annie. The tug and tow might, according to their own testimony, have gone within 30 feet of the southerly shore; at least 50 feet nearer than, upon the testimony, I feel compelled to find they were going. This alone would have avoided the Annie. The tug might also have ported, or have stopped her engines, earlier than she did, or she might have backed somewhat, if necessary, which she did not do at all. If due watch was kept of the approaching propeller from the time when the exchange of signals was given, when they were half a mile apart, which watch the Blue Bonnet was bound to keep, the dangerous course of the Annie towards the Blue Bonnet must have been observed upon the latter in time to have ported, or stopped her engines earlier than was done; and a little more promptness in either would also have avoided the collision. Her captain came upon deck a little before the collision and says that he saw at once that the steamers would hit. In such a dangerous bend in a narrow river a tug does not exercise due caution if she cause her tow to occupy unnecessa-

rily the full half of the stream; if she does so, it is her duty, upon the first indication of possible danger from another vessel approaching with the current, to change her course and give way betimes, as much and as early as possible. The tug had sufficient room to do so. She must have been at least 125 feet from the shore, and probably more than that, and there was no obstruction in that direction. She did port, as she ought to have done earlier, but too late to be of any service; and no previous signals of danger were given. In not giving any such additional signals, and especially in her failure to give way by porting or stopping, or in attempting to do either, until too late, there was such a want of that vigilance and caution which the situation demanded of her, that the Blue Bonnet must also be held in fault.

A decree should be entered against both vessels, with the usual order of reference.